IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM MAURICE SMITH<br><br>Defendant. | CR 15-15-BLG-SPW<br><br>ORDER |

This case comes before the Court on Defendant/Petitioner William Maurice Smith's motion to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255. (Doc. 163). Smith is a federal prisoner proceeding with appointed counsel.

The Court held an evidentiary hearing on June 7, 2024. (Doc. 219). Lori Suek argued for the United States, and Colin Stephens argued for Smith. (*Id.*). Both parties filed supplemental briefs on August 5, 2024. (Docs. 228, 229). Having heard the arguments and reviewed the evidence, the Court grants in part and denies in part the motion.

## I.    Background

### A.    *Pretrial Attorney Representation*

#### *1. David Merchant*

Smith was charged by complaint with Possession with Intent to Distribute

1

Methamphetamine under 21 U.S.C. § 841(a)(1) and Possession of a Firearm in Furtherance of a Drug Trafficking Offense under 18 U.S.C. § 924(c)(1)(A) on February 3, 2015. (Doc. 1). At his February 4, 2025 initial appearance, Federal Defender David Merchant, was appointed to represent Smith. (Docs. 5, 7). The Court's records show that Merchant appeared on behalf of all the defendants arraigned that day. (Doc. 185 at 18). Before the hearing, Merchant met with Smith in a secured visiting room inside the courthouse. (Doc. 180 ¶ 7). At the initial meeting, Merchant would typically read the pleading to the defendant, explain the federal process, and inquire about any medical or mental health conditions. (*Id.*). Merchant claimed by affidavit that he would never discuss the specific facts of a case with a defendant at this meeting. (*Id.*).

On February 5, 2015, Merchant moved to withdraw as counsel due to a conflict of interest. (Doc. 9). Merchant does not recall the basis for the conflict. (Doc. 180 ¶ 11).

On March 27, 2015, Merchant was appointed to represent Juel Graham. (Doc. 190 at 3). Graham had previously been interviewed by federal agents. (*See* Docs. 191-1, 191-2). During a February 3, 2015 interview, Graham told the agents that she lived with Smith, and told them Smith's address, the make and model of his car, that Smith distributed meth, and the first name of Smith's supplier. (*See* Doc. 191-1 at 1–3). In a second interview on February 4, 2015, Graham repeated the same

2

information about Smith. (Doc. 191-2). She added that she had known Smith about ten months; Smith had been distributing meth that entire time; Smith's supplier "fronted" Smith; Smith received meth on a weekly basis; and when Smith ran out of meth and his regular supplier was unable to supply his meth, Smith would purchase from a different supplier. (Doc. 191-2 at 1). She also provided information about Smith's associates. (*Id.* at 1–2).

Graham pled guilty to conspiracy to distribute methamphetamine. (Doc. 138 at 4:13–5:01). Graham received a reduced sentenced because she testified in a state murder case and provided information to federal investigators about drug-related activities in the Billings area. (*Id.* at 5:22–6:11).

On July 28, 2015, the agents again debriefed Graham. (Doc. 190 at 3). Merchant was present for the debrief. (*Id.*). Graham told the agents the following about Smith: a man named "M" sold meth to Smith, M had Graham duct taped and beat with a paddle because he thought she had given police information about Smith, and Smith was dealing with M. (Doc. 190-3).

At Smith's trial, Graham testified against Smith. (*See* Doc. 138 at 3:11–67:13). Graham hoped to receive a sentence reduction in exchange for her testimony. (Doc. 138 at 7:7–17).

In his affidavit, Merchant stated that he "never discussed a case with a client" during an initial appearance "or in the US Marshal's holding cell." (Doc. 180 ¶ 9).

3

Further, he "did not learn any confidential information from Mr. Smith," and he "certainly did not impart any confidential information to" Graham. (*Id.* ¶ 12).

### 2. *Kelly Varnes*

Kelly Varnes was appointed as Smith's attorney from February 5, 2015, until June 16, 2015. (Docs. 11, 27, 35). He represented Smith at his February 26 arraignment, at which Smith pleaded not guilty to the three counts in the Indictment—Conspiracy to Distribute Methamphetamine in violation of 21 U.S.C. § 846, Possession with Intent to Distribute Methamphetamine in violation 21 U.S.C. § 841(a)(1), and Possession of a Firearm in Furtherance of a Drug Trafficking Offense in violation of 18 U.S.C. § 924(c)(1)(A). Varnes then moved to suppress the evidence found in the search of Smith's hotel room on March 15, 2015. (Doc. 24).

On June 4, 2015, Smith called Varnes and left a voicemail saying that he intended to pursue an ineffective assistance of counsel claim against him. (Doc. 27-1 ¶ 3). On June 5, 2015, Varnes filed a motion to withdraw as counsel for Smith. (Doc. 27). The Court held a hearing on the motion and granted it on June 16, 2015. (Docs. 34, 35).

### 3. *Jennifer Dwyer*

The Court appointed Jennifer Dwyer as Smith's counsel on June 16, 2015. (Doc. 35). On August 21, 2015, Dwyer filed a second motion to suppress. (Doc.

4

42). On September 3, the Court held a hearing, at which Smith informed the Court that he wanted to retain his own counsel. (Doc. 46). At a subsequent hearing on September 24 the Court gave Smith two weeks to secure and confirm new counsel. (Doc. 48). On September 30, Dwyer moved to withdraw as Smith's counsel (Doc. 52), and the Court granted Dwyer's motion (Doc. 53). At a hearing on October 8 Smith informed the Court that he had been unable to secure counsel. (Doc. 54).

### 4. Thomas Pardy

The Court appointed Thomas Pardy to represent Smith on October 13, 2015. (Doc. 55). On October 15, the Court rescheduled the hearing on Smith's two suppression motions for November 10. (Docs. 56, 57).

On October 20, Pardy wrote Smith a letter, informing him that the Government had proposed a plea deal. (Doc. 179 at 5). The terms of the plea agreement, as conveyed by Pardy to Smith, were:

(1)   The charge against Smith would be amended to one count with a 5-to-40-year sentence range;
(2)   The Government would not offer a 5K departure;
(3)   There would no longer be a ten-year mandatory minimum sentence;
(4)   Both parties could argue for a sentence within the 5-to-40-year range; and
(5)   Smith would not be able to appeal the sentence.

(*Id.*). Pardy told Smith to inform him "as soon as possible" whether he wanted to accept or reject the plea agreement. (*Id.*). Smith received the letter while housed at Crossroads Correctional Center in Shelby. (Doc. 223 at 11:04–05). Smith

understood that the plea deal was time sensitive. (*Id.* at 45:06–10).

On October 23, 2015, Pardy spoke with Smith, and they discussed the plea agreement. (*See* Doc. 179 at 6). After that conversation, Smith wrote Pardy a letter, in which Smith proposed the following counteroffer:

(1) Smith would plead to possession with intent, the Government would drop the conspiracy and firearms charges, and the Government would move for a 5K departure;

(2) Smith would plead to the conspiracy charge for a smaller amount of drugs, the Government and Smith would agree to a guideline range of 0 to 20 years, and Smith would not be able to appeal the sentence; or

(3) The Government would agree to a guidelines range of 5 to 40 years, and Smith would be able to appeal.

(*Id.*).

Early on October 29, 2015, Smith was transferred from Crossroads Correctional Center in Shelby to Yellowstone County Detention Facility ("YCDF") in Billings. (*Id.* at 20:19–25). That same day, Pardy mailed Smith a letter at Crossroads Correctional Center, informing him that the Government would not agree to any of Smith's proposals.[1] (Doc. 179 at 7). The Government gave Smith the following options:

(1) Smith could agree to the current plea agreement: plead to a superseding information with a five-to-40-year sentence; waive all rights to appeal; he would cooperate but would not receive a 5K departure; and the Government would not file a 21 U.S.C. § 851 information; or

(2) Smith could plead to Count 1 of the indictment, a ten-years-to-life sentence range; he does not have to cooperate, but if he does there

---

1. The letter mistakenly is dated October 20, 2015, but Pardy explained in his affidavit that the letter was written on October 29, 2015. (*See* Doc. 179 at 3, 7).

would be a potential for a sentence reduction under 5K or Rule 35; and the Government would not file an § 851 information.

(*Id.*).    Pardy also informed Smith that the Government had extended Smith's deadline to accept the plea agreement until November 3, 2015, at 5:00 p.m. (*Id* at 8). Pardy's letter was returned because Smith had been transferred. (*Id.* at 9).

On November 2, 2015, Pardy visited Smith at YCDF before Smith was transferred to Big Horn County Detention Center ("Basin"). (Doc. 223 at 22:04–12; Doc. 229-1 at 30:12–14).  Smith claims he told Pardy that he had signed the plea agreement and that it was in a box for transport from YCDF to Basin. (Doc. 223 at 27:03–10).  In his deposition, Pardy testified that he did not remember any kind of "mailbasket" at YCDF (Doc. 229-1 at 36:21–37:11), nor did Smith ever tell him that he had accepted or signed the plea agreement (*id.* at 16:03–22, 39:02–12).

Also on November 2, Pardy mailed Smith a letter at Basin.  (Doc. 179 at 9). In that letter, he informed Smith that Pardy's October 29 letter was returned because Smith was no longer at Crossroads Correctional Center.  (*Id.*).  Pardy enclosed the October 29 letter and told Smith that he had "immediately contacted" the Government upon receiving the returned letter, and the Government agreed to extend the November 3 deadline for accepting the plea agreement.  (*Id.*).  Pardy told Smith to contact him by Friday, November 6, 2015.[2]  (*Id.*).  Smith never mailed the

---

2. Pardy told Smith to "read the letter and get in touch with me by close of business Friday." The Court takes judicial notice of the fact that Friday was November 6, 2015.

allegedly signed plea agreement to Pardy. (Doc. 223 at 28:09–14).

Within a day or two of arriving in Basin, and before receiving Pardy's November 2, 2015 letter, Smith mailed Pardy a letter, in which he told Pardy he had written an addendum to support the arguments for the suppression hearing. (Doc. 179-10 at 1). In his letter, Smith informed Pardy that they "need[ed] more time to work on an adequate suppression." (*Id.*). Smith asked Pardy to file a motion to continue the suppression hearing. (*Id.*).

On November 6, 2015, Pardy moved to vacate the suppression hearing scheduled for November 10 and continue it "indefinitely." (Doc. 59 at 1–2). In the motion, Pardy informed the Court that Smith had requested the continuance and needed to "augment the currently filed Motions." (*Id.* at 1).

On November 13, 2015, Pardy moved to withdraw as Smith's attorney. (Doc. 61). In the motion, Pardy stated that he had been offered and had accepted a position as the Deputy City Civil Attorney for the City of Billings. (*Id.* at 1). The Court relieved Pardy of his duties on November 23 and appointed Larry Jent as counsel for future proceedings. (Doc. 62). Jent and his co-counsel, Tucker Gannett, represented Smith through the conclusion of the case in this Court. (*See, e.g.*, Docs. 66, 94, 119, 124).

Smith testified that he did not tell Jent that he had signed the plea agreement for a five-to-40-year sentence. (Doc. 223 at 41:24–42:12). Smith further testified

that he asked Jent about his five-to-40-year plea deal, and Jent told him that the prosecution had withdrawn the offer. (*Id.* at 31:15–24). Jent told Smith that there was another, less favorable offer, and that Smith would be incarcerated until he was 65 years old. (*Id.* at 31:17–32:04). Smith did not accept that offer.

Smith first raised the issue of the signed plea agreement before the Court in a letter filed on August 31, 2016, the day before his sentencing hearing. (Doc. 116 at 3). In that letter, Smith claimed that Pardy failed to timely respond to the prosecution's original plea offer. (*Id.*).

In his deposition, Pardy testified that he recalled meeting in person with Smith twice: once at YCDF and once at Basin. (Doc. 229-1 at 30:07–21). Additionally, Pardy testified that he told Smith about the importance of signing the plea agreement because it would "get whatever mandatory things there are off the table." (*Id.* at 28:11–14). Pardy further testified that Smith neither accepted nor rejected the plea agreement; he just counteroffered. (*Id.* at 36:17–20).

B.    *Section 851 Enhancement*

Prior to trial, on March 28, 2016, the Government filed a Notice of Information Pursuant to 21 U.S.C. § 851. (Doc. 78). In the Notice, the Government declared its intent to increase Smith's potential penalty from a mandatory ten-year minimum sentence to a mandatory term of life imprisonment pursuant to 21 U.S.C. § 841(b)(1)(A) (2012) and 21 U.S.C. § 851 if Smith was found guilty of either drug

offense because he had two or more prior felony drug convictions.[3]  (*Id.* at 2).  The Notice listed Smith's six state felony drug convictions: five in Yellowstone County (sentenced in 1988, 1998, 2006, 2006, and 2011, respectively) and one in Big Horn County, Montana (sentenced in 2007).  (*Id.*).

### C.    *Trial and Sentencing*

Smith went to trial on the charges and was found guilty on all three counts of the Indictment on April 29, 2016.  (Doc. 99).  On September 1, 2016, this Court sentenced Smith.  Because Smith had two or more felony drug convictions, the Court applied the mandatory sentencing enhancement under § 851 and sentenced Smith to life in prison on the two drug offenses.  The Court sentenced him to five years in prison on the firearms charge, to run consecutive to the sentences on the drug offenses, for a total custodial term of life plus five years.  (Doc. 120).

Smith appealed.  (Doc. 128).  He raised eight issues, including: (1) the Court erred by not following the procedure under § 851(b) for the enhanced penalty, and (2) 21 U.S.C. § 851 is unconstitutional.  Appellant William Maurice Smith's Opening Brief at 19–34, 37–42, *Smith v. United States*, 733 F. App'x 415 (9th Cir. 2018) (No. 16-30210).  In an unpublished memorandum, the Ninth Circuit affirmed the sentence.  *Smith*, 733 F. App'x at 416.  The Ninth Circuit found § 851 was

---

3.  For readability, the Court will refer to Smith's sentencing enhancement under 21 U.S.C. § 841(b)(1)(A) and 21 U.S.C. § 851 as an enhancement under § 851.

constitutional, but that the Court failed to abide by § 851(b)'s procedural requirements. *Id.* However, the Ninth Circuit found the procedural error was harmless under § 851(e)—which bars a person from challenging the validity of a conviction that occurred more than five years before the date of the information alleging the prior conviction—because Smith would not have been able to challenge the validity of any of his previous state convictions. *Id.* The Supreme Court denied Smith's petition for a writ of certiorari. (Doc. 160).

### D.   Motion to Vacate

On November 2, 2020, Smith filed the instant motion, which was amended and supplemented several times. (Docs. 163, 165, 165-1, 171, 171-1, 172, 172-1, 175, 175-1). As part of its screening process, the Court ordered an expansion of the record. (Doc. 174 at 2). The Court ordered the Government to file all written communications with Smith's counsel concerning plea negotiations. (*Id.* at 3). It ordered Merchant to explain what conflict of interest led him to withdraw from representing Smith and to "set[] forth everything he learned from Smith or about Smith's case between his appointment on February 4, 2015, and his withdrawal on February 5, 2015." (*Id.* at 2). The Court also ordered Pardy to file all his written correspondence with Smith. (*Id.* at 2–3). Smith filed two affidavits in response. (Docs. 184, 184-1).

After its preliminary review, on December 19, 2022, the Court denied some

of Smith's claims (Doc. 185) and ordered the Government to respond to three of Smith's grounds for relief under § 2255: (1) ineffective assistance of counsel as to Merchant, (2) ineffective assistance of counsel as to Pardy, and (3) that Smith was actually innocent of the mandatory life sentence resulting from the enhancement in 21 U.S.C. § 851. (Doc. 186).

## II.   Legal Standard

The U.S. Constitution secures a prisoner's right to challenge unlawful confinement through a writ of habeas corpus. U.S. Const. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."). Generally, 28 U.S.C. § 2255 provides the "exclusive procedural mechanism" for federal prisoners to test the legality of their detention through a collateral attack on their conviction. *Lorentsen v. Hood*, 223 F.3d 950, 953 (9th Cir. 2000). Section 2255 provides that "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States [...] may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

## III.   Discussion

The Court will address Smith's ineffective assistance of counsel and actual innocence claims in turn.

### A.   *Ineffective Assistance of Counsel Claims*

The Sixth Amendment guarantees the right to effective assistance of counsel at trial. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984).  To establish an ineffective assistance of counsel claim, the petitioner bears the burden of showing both that: (1) "counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Id.* at 687; *see also Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) ("*Strickland* requires a defendant to establish deficient performance and prejudice.").

To prove deficient performance, the petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. When considering counsel's performance, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690).

To "affirmatively prove prejudice," the petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 693–94. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. The Court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies" if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice." *Id.* at 697.

### 1. *Ineffective Assistance of Counsel as to Merchant*

Smith claims that Merchant provided ineffective assistance of counsel because he had a conflict of interest when he successively represented Smith and then Graham. Smith argues that Merchant could have received information from Smith on July 4 or 5 that Merchant could have shared with Graham, and that Graham possibly used against Smith in her testimony. (Doc. 171 at 11).

In response, the Government asserts that there is "nothing of evidentiary significance that Graham added or changed" to her testimony after Merchant started

representing her. (Doc. 190 at 3). Further, Merchant filed an affidavit denying Smith's claims that Smith shared any confidential information with him. (*Id.* at 4).

On reply, Smith asserts that "[l]ogic dictates that some discussion of the case must have necessarily occurred" between himself and Merchant. (Doc. 201 at 5). Additionally, "it is not beyond belief that Smith and Mr. Merchant discussed a release plan," which would have included information about Smith's girlfriend, Graham. (*Id.* at 5–7).

The right to counsel provides "a correlative right to representation that is free from conflict of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). To establish a constitutional violation based on a conflict of interest, the petitioner must show an "actual conflict"—that the attorney's performance was "adversely affected" by the conflict. *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). An actual "conflict of interest" in a *Strickland* claim arises when there is "a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002). In cases of successive representation, "conflicts of interest may arise if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties." *Hovey v. Ayers*, 458 F.3d 892, 908 (9th Cir. 2006) (quoting *Mannhalt v. Reed*, 847 F.2d 576, 580 (9th Cir. 1988)).

Because Merchant represented Smith and then Graham, and because Smith alleges that Merchant shared privileged communications, the Court finds that Smith has alleged a theoretical conflict of interest. However, Smith fails to show an actual conflict of interest. Smith does not provide evidence that any information he provided in privileged communications to Merchant on July 4 or 5 was later used by Merchant to Smith's detriment in Merchant's subsequent representation of Graham. Smith does not explain what privileged information he told Merchant nor identify the information that Merchant received from Smith that Graham repeated in her interviews or testimony.

Because Smith fails to show an actual conflict of interest, Smith cannot satisfy the first *Strickland* prong. Accordingly, Smith's ineffective assistance of counsel as to Merchant is denied.

### 2. *Ineffective Assistance of Counsel as to Pardy*

Smith next claims ineffective assistance of counsel as to Pardy. Smith argues that, though that he cannot provide evidence that he accepted the plea agreement, he does not need to because Pardy was ineffective by failing to create the circumstances in which Smith could accept the plea agreement. (Doc. 228 at 6). Smith argues that, under the standard in *Frye*, Pardy should have conveyed any plea offers to Smith, provided advice on the plea offer, and allowed time for Smith to consider the offer. (*Id.* at 8 (citing *Missouri v. Frye*, 566 U.S. 134, 144 (2012))). Because Pardy

16

withdrew as counsel supposedly in the middle of negotiations, Smith was "deprived . . . of his chief negotiator at the most critical point in the process." (*Id.* at 9). Smith asserts that such behavior is objectively unreasonable. (*Id.* at 10).

The Government argues Smith fails to prove that he signed the plea agreement and thus fails to meet his burden to show ineffective assistance of counsel. (Doc. 229 at 8). The Government asserts that Smith never signed the plea agreement, and if he had, Pardy would have immediately communicated Smith's acceptance to the Government. (*Id.* at 6–7). The Government further argues that Smith's behavior is inconsistent with signing the plea agreement: Smith did not, through counsel, tell the Court or the Government that he had signed the plea agreement prior to the deadline; tell Jent that he had a signed plea agreement; nor raise the issue of the plea agreement until after the Court denied his motion to suppress. (*Id.* at 8–10).

"[P]lea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages." *Frye*, 566 U.S. at 143. "[D]efense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Id.* at 145. In determining the standard for counsel's performance in communicating plea offers, courts look to codified standards of professional

practice, such as the American Bar Association's ("ABA") publications and the Montana Rules of Professional Conduct. *See id.* at 145–46. Any analysis begins with "a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*, 466 U.S. at 689).

The ABA standards require a reasonable attorney to "promptly communicate to the client every plea offer and all significant developments, motions, and court actions or rulings, and provide advice[.]" Criminal Justice Standards, Defense Function § 4-5.1(c) (Am. Bar Ass'n 2017). The Montana Rules of Professional conduct likewise require that a lawyer be "competent, prompt and diligent." Mont. R. Prof'l Conduct Preamble (5). When an attorney withdraws as counsel, they must "take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client [and] allowing time for employment of other counsel[.]" Mont. R. Prof'l Conduct 1.16(d).

The Court finds that Pardy acted reasonably, and thus, Smith's claim for ineffective assistance of counsel as to Pardy fails. First, the record does not show that Smith accepted the plea agreement. Though Smith and Pardy disagree as to whether Smith informed Pardy that he accepted the plea agreement, the Court agrees with the Government's inference that, had Smith told Pardy that he had accepted the

agreement, Pardy would have immediately conveyed that acceptance to the Government. Pardy says as much in his deposition. (Doc. 229-1 at 16:03–22).

Additionally, Smith's behavior was inconsistent with him accepting the plea offer: he counteroffered the Government's proposed agreement; he did not give Pardy the signed plea agreement in person or mail it to Pardy; he did not tell Jent that he had already accepted a plea agreement; and he did not inform the Court about the signed plea agreement until the day before sentencing when it was apparent to Smith that he was subject to a mandatory life sentence.

Second, Pardy acted reasonably by promptly communicating to Smith via letter all formal offers from the Government and in promptly communicating Smith's counteroffer to the Government. Pardy informed Smith of the Government's response and the deadline for accepting the offer, as well as when the deadline was extended. Pardy also informed Smith that the offer was time sensitive. When Smith was transferred and the communication was delayed, Pardy arranged for an extension of the deadline to accept the plea offer.

While Smith argues that Pardy acted unreasonably by not providing sufficient guidance during the process, such a contention conflicts with Pardy's testimony that he informed Smith about the importance of signing the plea agreement because it would "get whatever mandatory things there are off the table." Additionally,

Smith's handwritten counteroffer to the Government shows that Smith played an active role in the negotiations.

To the extent that Smith asserts that the lack of in-person meetings with Pardy was unreasonable, the Court cannot say that Pardy's performance fell below an objective standard of reasonableness, since Pardy met with Smith in person twice, coupled with the strong presumption that his performance fell within the "wide range of professional assistance." *See Kimmelman*, 477 U.S. at 381.

Third, Pardy reasonably believed that Smith was no longer interested in a plea offer by the time he withdrew as counsel on November 13, 2015, and therefore did not act unreasonably by not communicating with the Government or the Court about the plea agreement before withdrawing. Pardy gave Smith until November 6, 2015, to contact him about the plea agreement. On that day, Pardy received a letter from Smith that did not mention the time-sensitive plea agreement. A reasonable attorney could believe at that point that Smith was no longer interested in pleading guilty.

Last, when Smith's November 6 letter instructed Pardy to continue the hearing on his motion to suppress so the briefing could be amended, a reasonable attorney could believe that Smith no longer planned to plead guilty because doing so is inconsistent with maintaining a motion to suppress. *See Tollett v. Henderson*, 411 U.S. 258, 267 (1973) ("When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not

20

thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.").

For these reasons, the Court finds that Smith fails to show that Pardy provided ineffective assistance. Smith's motion is denied as to ineffective assistance of counsel by Pardy.

###### B.    Section 851 Sentencing Enhancement

Smith next asserts that his sentence enhancement under § 851 was unlawful for three reasons. First, he argues that Jent's failure to object to the Government's § 851 notice constitutes ineffective assistance of counsel. (Doc. 201 at 19). Next, he argues that the Court erred by not following the procedural requirements of § 851, and that Jent's failure to ensure that the Court followed the procedural requirements constitutes ineffective assistance of counsel. (*Id.* at 21–24). Finally, Smith asserts that he is actually innocent of the life sentence imposed pursuant to § 851 enhancement because his drug convictions under Montana law do not qualify as felony drug offenses. (*Id.* at 25–28).

The Government argues the § 851 enhancement was lawfully applied and the life sentence lawfully imposed because Smith's state convictions fall within the federal definition of a felony drug offense. (Doc. 229). The Government reasons that since Smith's state drug convictions all involve methamphetamine, and the definition of methamphetamine under Montana law has always been identical to the

federal definition, his state sentences meet the federal definition of a felony drug offense. (*Id.*). The Government also asserts three affirmative defenses: (1) the law of the case doctrine precludes Smith from relitigating this issue; (2) a claim of actual innocence can only be made relative to a count of conviction and not to a sentencing enhancement statute; and (3) if the issue argued before the Ninth Circuit is different than Smith's argument here, the claim is procedurally defaulted. (*Id.* at 11).

The Court will first address the Government's affirmative defenses.

### 1. Law of the Case

"Under the 'law of the case' doctrine, 'a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case.'" *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (quoting *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993)); *see also Arizona v. California*, 460 U.S. 605, 618 (1983) (holding that a judicial determination at one stage of a proceeding "should continue to govern the same issues in subsequent stages in the same case."). "The law-of-the-case doctrine generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Musacchio v. United States*, 577 U.S. 237, 244–45 (2016) (quoting *Pepper v. United States*, 562 U.S. 476, 506 (2011)). "The doctrine applies most clearly where an issue has been decided by a higher court; in that case, the lower court is precluded from reconsidering the issue

22

and abuses its discretion in doing so except in limited circumstances[.]" *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018).  Those circumstances arise where: (1) the first decision was clearly erroneous; (2) intervening change in the law has occurred; (3) evidence on remand is substantially different; (4) other changed circumstances exist; and (5) manifest injustice would otherwise result. *Alexander*, 106 F.3d at 876.

On appeal, Smith argued that § 851 was unconstitutional and that the Court erred by not following the procedure under § 851(b) for the enhanced penalty.  In the instant motion, Smith argues, in part, that the Court erred in not abiding by the procedural requirements of § 851, and that Jent was ineffective because he failed to challenge the procedure under § 851 during sentencing.  These arguments are the same claims Smith made prior and the Ninth Circuit already resolved.  Neither party has argued, and the Court does not find, that any of the "limited circumstances" that would allow the Court to reconsider the issues are present here.  Accordingly, the law of the case doctrine bars the court from reconsidering those issues.

By contrast, Smith's actual innocence claim here is different than the arguments made previously before this Court and the Ninth Circuit.  This issue is not foreclosed by the law of the case, so the Court will consider it.

## 2. *Actual Innocence Under* Allen v. Ives

The Government contends that Smith's remaining argument—he is actually innocent of the § 851 enhancement—is not viable because a "claim of actual innocence can only be made relative to the count of conviction." (Doc. 229 at 11).

"To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (internal citation and quotation marks omitted). Actual innocence means factual innocence, not mere legal insufficiency. *See Sawyer v. Whitley*, 505 U.S. 333, 339 (1992).

In *Allen v. Ives*, the Ninth Circuit found that a defendant can show actual—or factual—innocence of a mandatory sentencing enhancement. 950 F.3d 1184, 1189–90 (9th Cir. 2020). In that case, the defendant filed a habeas petition under 28 U.S.C. §§ 2255(e) and 2241 to challenge the application of the career offender sentence enhancement. *Id.* at 1188–89. The Ninth Circuit found that an actual innocence claim may arise when a "conviction under a statute is not a conviction for a predicate crime." *Id.* at 1188. In other words, if the elements of the offense of the state law conviction are broader than those of the federal statute, the state law conviction cannot serve as a "predicate offense" for the federal conviction, and the defendant is actually innocent of the sentence enhancement. *See Mathis v. United States*, 579 U.S. 500, 509 (2016) ("How a given defendant actually perpetrated the crime—what

we have referred to as the underlying brute facts or means of commission, makes no difference; even if his conduct fits within the generic offense, the mismatch of elements saves the defendant from a . . . sentence [enhancement].") (internal citation and quotation marks omitted).

After the decision in *Allen*, a habeas petitioner who received a sentence enhancement under a mandatory sentencing scheme can show actual innocence of the enhancement if the prior convictions do not qualify as "predicate offense[s]." *Id.*; *see Shepherd v. Unknown Party, Warden, FCI Tucson*, 5 F.4th 1075, 1077 (9th Cir. 2021); *United States v. Bailey*, CR 13-62-BLG, 2023 WL 2757200, at *4 (D. Mont. Apr. 3, 2023) (finding a colorable actual innocence claim when the petitioner claimed that his three state robbery convictions under Montana law were not predicate "violent felony" convictions under the Armed Career Criminal Act).

Accordingly, Smith may claim that he is actually innocent of the sentencing enhancement under § 851.

### 3. Procedural Default

A defendant who fails to raise a claim on direct appeal is generally barred from raising the claim on collateral review in federal habeas cases. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 350–51 (2006). The petitioner can overcome this "procedural default" if he "can first demonstrate either cause and actual prejudice,

or that he is actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998) (internal citations and quotation marks omitted).

Smith did not challenge the application of his state sentences as predicate offenses for his § 851 enhancement on direct appeal, so this claim is procedurally defaulted. Smith does not argue cause and prejudice. Rather, he argues that he is actually innocent. If Smith shows actual innocence, he can overcome the procedural default.

### 4. Section 851 Sentencing Enhancement

Having found that a defendant can claim actual innocence of a mandatory sentence enhancement, and that a demonstration of actual innocence can overcome procedural default, the Court now looks to the merits of Smith's claim that he is actually innocent of the mandatory enhancement under § 851.

Section 841(b)(1)(A) provides for an enhanced mandatory minimum sentence if a defendant is found to have violated 21 U.S.C. § 841(a). In 2016 when Smith was sentenced, § 841 mandated a life sentence if a defendant had two prior convictions for a "felony drug offense." 21 U.S.C. § 841(b)(1)(A) (2012); *cf.* First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5220 (codified as 21 U.S.C. § 841(b)(1)(A)). A "felony drug offense" was defined as "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State . . . that prohibits or restricts conduct relating to narcotic drugs, marijuana,

anabolic steroids, or depressant or stimulant substances." 21 U.S.C. § 804(44) (2012). Section 851 outlines the procedures that must be followed for the enhanced mandatory minimum sentence to apply.

Smith's criminal history includes six state drug convictions in Montana for possession or distribution of methamphetamine. Due to those convictions, the Court applied the § 851 sentence enhancement and sentenced Smith to life on his two drug convictions.

Smith now argues the Court erroneously applied the § 851 enhancement because his state drug offenses are not felony drug offenses. The Government asserts that the Montana and federal definitions of methamphetamine have always been identical, so Smith's prior felony drug offenses all "fall within the federal definition of felony drug offense" as required by § 841(b)(1)(A).

The Court agrees with the Government. All of Smith's prior state drug offense convictions involve methamphetamine, as do his drug offense convictions here. The definition of methamphetamine under Montana and federal law are identical and have always been identical. *Compare* 21 C.F.R. § 1308.12(d)(2)[4] (defining methamphetamine as "Methamphetamine, its salts, isomers, and salts of its isomers") *with* Mont. Code Ann. § 50-32-224(3)(d) (defining methamphetamine as

---

[4] The federal definition of methamphetamine is unchanged from even before Smith was sentenced until now. *See* 39 Fed. Reg. 22140, 22142 (June 20, 1974) (defining methamphetamine as "Methamphetamine, its salts, isomers, and salts of its isomers").

"Methamphetamine, its salts, isomers, and salts of its isomers").[5] Therefore, Smith's prior state drug offense convictions fall within the federal definition of a felony drug offense and qualify as predicate offenses for purposes of the enhancement under § 851. Smith is not actually innocent of the life sentences imposed by the Court.

### 5. Jent's Ineffective Assistance

Smith last argues that Jent's failure to object to the Government's § 851 notice and his failure to ensure that the Court followed the procedural requirements of § 851(b) constitutes ineffective assistance of counsel. The Ninth Circuit held in its 2018 memorandum affirming Smith's sentence in this case that "Smith would not have been able to challenge his previous convictions, as listed in the Information, even if the district court had afforded him the opportunity to do so" because the convictions occurred more than five years before the date of the information alleging such prior convictions. (Doc. 153 at 3 (citing 21 U.S.C. § 851(e))). Therefore, the Court's failure to abide by the procedural requirements of 21 U.S.C. § 851(b) was harmless error. (Id.).

Likewise, Jent's failure to object to the Government's § 851 notice and his failure to ensure that the Court followed the procedural requirements does not constitute ineffective assistance of counsel, as Smith suffered no prejudice, because

---

[5] The Montana definition of methamphetamine also is unchanged since the statute's enactment in 1974.

the result of the proceeding would not have been different but for Jent's alleged deficient performance. *Strickland*, 466 U.S. at 693–94. Further, given the fact that Smith would not have been able to challenge his previous convictions pursuant to § 851(e), the Court does not conclude Jent's representation fell below an objective standard of reasonableness, and was, therefore, ineffective. *Id.* at 688.

## V.   Conclusion

IT IS SO ORDERED that Defendant William Maurice Smith's motion under 28 U.S.C. § 2255 (Doc. 163) is DENIED.

DATED this __11th__ day of September, 2024.

SUSAN P. WATTERS
United States District Judge